FILED

2019 Jul-29  AM 11:17
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA

MCGRIFF SEIBELS & WILLIAMS, INC., )
)
)
Plaintiff, )
)
v. )        Case No. _____
)
PAUL SPARKS, DARREN )               **JURY DEMANDED**
SONDERMAN, DAVID McMAHAN, )
and JOHN TANNER, )
)
Defendants. )

---

## VERIFIED COMPLAINT

---

COMES NOW, McGriff, Seibels & Williams, Inc. ("Plaintiff" or "MSW") and hereby asserts its Complaint against Defendants Paul Sparks ("Sparks"), Darren Sonderman ("Sonderman"), David McMahan ("McMahan") and John Tanner ("Tanner") (collectively "Defendants") and seeks a temporary restraining order, preliminary injunctive relief, permanent injunctive relief and monetary damages. Plaintiff MSW avers as follows:

## I.   INTRODUCTION

1.    For months, while employed by MSW and while cashing their paychecks, these former executives and others conspired to compete with MSW thereby breaching their duty of loyalty and fiduciary duties. In violation of state

law and their employment agreements, the Defendants have engaged in a coordinated effort to attempt to cripple their former employer, MSW. This is an action to stop their active solicitation of MSW employees and clients and to compensate MSW for its losses.

## II.    PARTIES

2.    MSW is an Alabama corporation headquartered in Birmingham, Alabama, which does business in Jefferson County, Alabama and across the State of Alabama. MSW is an insurance brokerage and provides property and casualty insurance, employee benefits, life and pension plans, financial services, and surety products, as well as specialty insurance programs. It specializes in commercial insurance, construction risk, energy and marine, executive risk, recreational marine, and surety, as well as employee benefits, health, wellness, and retirement programs.

3.    Paul Sparks is a resident of Colorado and is over the age of 19.[1] Prior to his resignation, Sparks served as MSW's Senior Executive Vice President of its Financial Services Division. Sparks has been and is working with Cobbs Allen &

---

[1] In an attempt to forum shop, Sparks filed a declaratory judgment action in Cobb County, Georgia. In his Complaint, he contends he is a Georgia resident. See Sparks Cobb County Complaint, attached as **Exhibit A**. However, as of September 6, 2016, he affirmatively changed his residence from Georgia to Colorado. See Primary Address Changes, attached as **Exhibit B** . Moreover, as recently as February 21, 2019, his joint checking account shows a Denver, Colorado address. See Redacted Check and Disbursement Request, attached as **Exhibit C**. The disbursement was sent to his Colorado address. His car is titled in Colorado. See **Exhibit D**. Sparks' representation he is a Georgia resident is a misrepresentation to the Georgia state court. MSW has removed the action to federal court and filed a Motion to Transfer the Georgia action as it should have been filed in Alabama. Copies will be provided to this Court.

Hall ("Cobbs Allen"). Like MSW, Cobbs Allen is an insurance broker.  Like MSW, Cobbs Allen offers property and casualty insurance, employee benefits, life and pension plans, financial services, and surety products, as well as specialty insurance programs.  Cobbs Allen is a competitor of MSW. [2]

4.     Darren Sonderman is a resident of Georgia and is over the age of 19. Prior to his resignation, Sonderman served as Executive Vice President of MSW's Financial Services Division.   Sonderman has been and is working with Cobbs Allen, MSW's competitor.

5.     Sparks and Sonderman are performing the same duties for Cobbs Allen that they did for MSW.  See **Exhibit E**.

6.     David McMahan is a resident of Georgia and is over the age of 19. Prior to his resignation, McMahan served as Senior Vice President of MSW's Financial Services Division.  McMahan has been and is working with Cobbs Allen, MSW's competitor.

7.     John Tanner is a resident of Georgia and is over the age of 19.  Prior to his resignation, Tanner served as Executive Vice President of MSW's Financial Services Division.   Tanner has been and is working with Cobbs Allen, MSW's competitor.

---

[2] Yesterday, Cobbs Allen announced the creation of its Specialty Insurance Brokerage.  See Cobbs Allen Press Release, attached as Exhibit E.

3

8.     All Defendants made well over $100,000 each.   Sonderman and Sparks made over seven figures in compensation.

### III.   JURISDICTION AND VENUE

9.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.   There is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3).

### IV.   FACTS

**A.     Employment of Defendants by MSW**

11.     Sparks and Sonderman were both hired by MSW on December 31, 1997.

12.     As Senior Executive Vice President for MSW, Sparks was responsible for the overall leadership of MSW's Financial Services Division ("FSD") and MSW's clients and employees throughout MSW.   In that role, Sparks led, along with Sonderman, the develop and execution of the FSD's business strategies, including which insurance products they would develop and promote, which insurance carriers they would prioritize for MSW's clients, and which client prospects to pursue and which courses of action would deliver the best insurance programs for MSW clients. These business, including client, responsibilities, provided Sparks with access to MSW's confidential and proprietary information

4

and trade secrets regarding its carrier and client relationships. Sparks' duties and responsibilities also included leadership, shared with Sonderman, over FSD's employee recruitment, management, and retention practices company-wide.  In his role, Sparks participated in determining FSD employees' compensation, incentives, job duties, and performance evaluations.

13.    In Sonderman's role as Executive Vice President, he was responsible for many of the same facets of FSD's strategy and business as Sparks.  Specifically, Sonderman also helped lead MSW's FSD, including MSW's clients and employees throughout MSW.  Sonderman, along with Sparks, led the develop and execution of the FSD's business strategies, including which insurance products they would develop and promote, which insurance carriers they would prioritize for MSW's clients, and which client prospects to pursue and which courses of action would deliver the best insurance programs for MSW clients. These business, including client, responsibilities, provided Sonderman with access to MSW's confidential and proprietary information and trade secrets regarding its carrier and client relationships.  Sonderman's duties and responsibilities also included leadership, shared with Sparks, over FSD's employee recruitment, management, and retention practices company-wide.  In his role, Sonderman participated in determining FSD employees' compensation, incentives, job duties, and performance evaluations.

5

14.    On their first day of employment, they signed Employment

Agreements.

15.    Their Employment Agreements  include several restrictive covenants.

<u>See</u> Employment Agreements of Sparks and Sonderman, attached as **Exhibit F**.

16.    Specifically, they agreed:

<u>While employed by Employer</u>, <u>Employee agrees</u> <u>to devote all of the</u>
<u>Employee's working time and efforts to the performance of</u>
<u>Employee's duties</u> as assigned to Employee from time to time by the
officers or board of directors of Employer, <u>and to undertake no course</u>
<u>of action contrary to the best interest of the Employer</u>.

<u>See</u> Paragraph  2, Exhibit F (emphasis added).

17.    The Agreements also state:

<u>During Employee's employment with Employer, Employee agrees to</u>
<u>devote Employee's best efforts to further the interests of Employer</u>.
Employee further agrees that, <u>while Employee is employed by</u>
<u>Employer</u>, Employee <u>will not at any time or in any place, directly or</u>
<u>indirectly, engage or consult in a business similar to, or competitive</u>
<u>with</u>, the business engaged in by Employer…

<u>See</u> Paragraph 3, Exhibit F (emphasis added).

18.    Further, they agreed:

Employee shall <u>treat as confidential all trade</u> secrets and confidential
information <u>received in the course of this employment</u>, and <u>shall not</u>
<u>disclose</u> such information <u>during such employment</u> or hereafter; <u>nor</u>
<u>shall Employee disclose or use such secrets or information in any</u>
<u>subsequent employment</u>.

<u>See</u> Paragraph 2, Exhibit F (emphasis added).

19.    Moreover, the Agreements provide:

4811-2951-2093
5023063-101716

[I]n the event of the termination of employment of Employee, whether voluntary or involuntary, and <u>for a period of two years after the termination of employment, Employee will not, directly or indirectly, on his own behalf or on behalf of others contact, solicit, make sales to or attempt to procure business from any "client" or "prospective client"</u> (as defined hereafter) of Employer within the states of Georgia, Florida, Alabama, Mississippi, Texas, Tennessee, Louisiana, South Carolina and North Carolina.

<u>See</u> Paragraph 4, Exhibit F.

20.     Sparks and Sonderman also promised not to solicit employees:

Employee also agrees that during such <u>two-year period</u> Employee shall not, <u>directly or indirectly, solicit or induce any employees of Employer to leave the employment of Employer or enter any business competitive with Employer</u>.

<u>See</u> Paragraph 4, Exhibit F.

21.     Importantly, their Agreements have clear choice of law and choice of

venue provisions:

In the event of any litigation between the parties (including, but not limited to, any dispute involving the subject matter or terms of this Agreement), the parties agree that any and all actions shall be brought and litigated in a state or federal court located in Jefferson County, Alabama <u>where in this Agreement is executed</u>, and that no party shall request a transfer of such an action to a court outside Alabama, <u>nor shall any party file an action in any other state</u>.  <u>The parties further agree that such a court in Jefferson County, Alabama shall be the only proper forum for litigating such dispute and Employee agrees to submit to the jurisdiction of such court in Alabama</u>.

<u>See</u> Paragraph 11, Exhibit F.

22.     On June 16, 2003, MSW hired John Tanner.

7

23.    In his role as MSW's Executive Vice President, Tanner performed a broad range responsibilities important to FSD, including but not limited to: serving as Claims Counsel for FSD; managing FSD's claims advocacy strategy, execution, and employees; developing relationships with insurance carriers, MSW client prospects, and MSW clients; preparing insurance policy forms that were and are unique and proprietary to MSW; and participating in the recruitment, management, and retention of FSD employees, including participating in the determination of their compensation, incentives, and performance evaluations.  These job duties and responsibilities provided Tanner with access to MSW's confidential and proprietary information and trade secrets regarding its carrier and client relationships.

24.    Tanner also signed an Employment Agreement on his first day of work.  It is the same agreement as Sparks' and Sonderman's.  See Tanner Employment Agreement, attached as **Exhibit G**.

25.    On May 2, 2016, MSW hired David McMahan as a Senior Vice President and he signed an Employment Agreement on that date.[3]  See McMahan Employment Agreement, attached as **Exhibit H**.  In his role as a Senior Vice President and a Producer, McMahan had access to confidential and proprietary information and trade secrets regarding MSW's client prospects and clients.

---

[3] McMahan's agreement is with McGriff, Seibels & Williams of Georgia, Inc., a Georgia corporation, subsidiary of McGriff, Seibels & Williams, Inc., an Alabama corporation with its principal place of business in Alabama.  MSW of Georgia was merged into MSW, Inc. several years ago and is now a dba.

4811-2951-2093

5023063-101716

26.     McMahan's Employment Agreement is different than the other three in form but not in substance.

27.     His Agreement requires him to "act and perform services on an exclusive basis on behalf of Employer."  <u>See</u> Paragraph 1, Exhibit H.

28.     McMahan's Employment Agreement forbids him from soliciting employees.  In particular, it provides:

> Employee will not, during the term of his or her employment and for a period of <u>two years following the date of termination</u> of Employee's employment (regardless of the reason for the termination of employment), whether for himself or on behalf of any other person or entity:
>
> (i)     <u>solicit, participate in, or promote the solicitation of any person, with whom Employee worked or had business contact while employed by Employer, to leave the employ of Employer</u> if such person was employed by Employer at any time during the six months preceding the date of the Employee's termination of employment from Employer or if such person is employed by Employer on the date of Employee's termination of employment from Employer.

<u>See</u> Paragraph 6 a. (1)(i), Exhibit H (emphasis added).

29.     He promised not solicit customers for two years.  Specifically, his Employment Agreement states he will not for himself or on behalf of any other person or entity:

> solicit, divert, or take away, or attempt to solicit, divert or take away, on his or her behalf or on behalf of any business in competition with Employer, any "McGriff Customer"… or "McGriff Prospective

9

Customer"… for the purpose of engaging in any "Competitive Activity…"  All terms were defined in the Employment Agreement.

<u>See</u> Paragraph 6 a.(1)(iii), Exhibit H.

30.    McMahan agreed "not to disclose or use for the purpose of competing with Employer, directly or indirectly, or aid anyone else by disclosing to any third party, either directly or indirectly, all or any part of any Confidential Information." <u>See</u> Paragraph 9, Exhibit H.

31.    Like the other three Employment Agreements, the Agreement has a choice of law provision that selects Alabama.  <u>See</u> Paragraph 14, Exhibit H.

32.    During the course of their employment with MSW, all four Defendants traveled to Alabama, including to Birmimgham.  For example, Sparks and Sonderman participated in the semi-annual strategic meetings in February and August in Birmingham.  They all serviced clients throughout the state of Alabama.

**B.    The Conspiracy Begins**

33.    At least as of April or May, Sonderman and Sparks began plotting to compete with MSW.

34.    Sonderman began telling his team members not to attend certain meetings because "too many people were attending."  As a result, those employees committed to MSW were kept at an arm's length from those MSW clients. Sonderman and Sparks boxed out loyal MSW employees so they could lure clients away.

35.    On the return travel from Alabama on or around May 7, 2019, Sonderman approached Dusty Cahill, an MSW Senior Vice President in the Financial Services Division, about leaving MSW.   In response, Cahill told his supervisor, Sonderman, that he had concerns about going somewhere new.

36.    Later, Sonderman took Cahill to lunch and gave him details about his plans to leave MSW.   He told Cahill he was going to Cobbs Allen and if Cahill joined him Cahill would get equity in the business.   According to Sonderman, Cahill would make $5 to $10 million.   He told Cahill "we want you."

37.    In an email recovered from Sonderman's computer, he opined about the timing and asked himself "are we rushing.   Are there better strategies."   The email is dated May 30th – while Sonderman was serving as a highly paid senior MSW executive.

38.    He gave himself marching orders like "messaging has to be precise and clear" and "[w]e need to quantify exactly what future risk is to personnel.   We have to create a future opportunity that establishes economic safety for staff."

39.    He urged "[w]e need to message to our own people clearly and make sure we understand what they want.   Make sure we are not saving them from something they don't want to be saved from."

11

40.    He mused "[n]eed to understand sales/production model at JLT [another competitor] and how it is similar or different than ours.  How can these be meshed and optimized."

41.    Soon after his lunch with Sonderman on June 6, 2019, Cahill received a LinkedIn request from Bruce Denson, Jr., President & Chief Operating Officer of Cobbs Allen.  See LinkedIn message, dated June 7, 2019, attached as **Exhibit I**.

42.    He worried about needing to be completely protected in case of litigation.

43.    Before accepting the request from Denson, who was unknown to Cahill, Cahill asked Sonderman if it related to their prior discussion.  Sonderman stated it did and urged Cahill to "talk to him."

44.    Cahill accepted the LinkedIn request and Denson asked to "catch up by phone."  See Exhibit I.

45.    On June 10, 2019, Cahill called Denson, who was in his office in Birmingham, Alabama.  During that call, Denson asked to meet with Cahill.

46.    The two met later that week at the restaurant in the Whitney Hotel in Atlanta, Georgia.

47.    In or around this same time, Sparks instructed members of his MSW team not to meet with clients.

4811-2951-2093
5023063-101716

48.     Sparks also solicited Cahill.  On one trip, he said, "I'm not soliciting you but be careful.  You'll be there [MSW] by yourself.  You're going to be miserable."  He told Cahill "not to make the money grab," which Cahill understood Sparks to say do not remain at MSW even if they offer you more money to stay.

49.     Sonderman told Cahill he was going after an "A Team" which included 10 MSW employees and potentially two more.  Upon information and belief, each person named in the "A Team" list has been solicited by at least one of the Defendants and/or Denson.

50.     At one point, Sonderman said he would "leave no weapons behind" and referenced the Art of War.

## C.     Six Executives Resign and Join Cobbs Allen

51.     On June 29, 2018, Sparks reached out to John Howard, the Chairman of the Board for MSW.  Specifically, Sparks asked to discuss "outlook/strategy," among other things.

52.     Initially, the two were to meet in New York on July 11th but on July 4th, Sparks asked to talk sooner.  According to Sparks, there were assumptions being made about his future at McGriff - which was one of the things he wanted to discuss.  Howard agreed to discuss on July 5th.  Howard asked if Sparks had talked to Rick Ulmer about his issues.  Sparks did not respond.

4811-2951-2093
5023063-101716

53.     During the July 5th conversation, Sparks indicated he wished to retire but that he had been pursuing for some time an opportunity to create a specialty broker which would be majority owned by employees.  Private equity and family would also fund it.  According to Sparks, at some point, the specialty broker would compete with MSW.  At first, it would be limited to a few states but eventually it would be national.  They intended to focus on financial institutions, technology and energy.  It would open in September but Sparks wanted to retire as of August 30 when his Restricted Stock Units would vest.  He stated his Employment Agreement was not strong but that he intended to follow it.

54.     Sparks stated it would be a good opportunity for MSW with high level technology.  At the end of the call, Sparks stated if Howard would sign an NDA, he would share the opportunity with him.  Sparks stated he would repay his MSW loan and act professionally.   If Howard wanted, Sparks would submit his resignation that day.  Howard suggested he talk to Ulmer about the NDA and the proposal.

55.     On July 9, 2019, Ulmer, Read Davis (President of MSW of Georgia), and Gary Cooney (Co-Vice Chairman) met with Sparks and Sonderman for dinner in New York City to try and persuade them to remain at MSW.  Sparks was adamant that he was not going to change his mind.  Sparks suggested MSW invest

in the venture.  If they would sign an NDA, he would send them a Confidential Information Memorandum ("CIM").  Sonderman was clear: he had **not** resigned.

56.     On July 11, 2019, Sparks sent the CIM to Ulmer.  In so doing, Sparks noted he would have "them 'scrub' the presentation of any names and other proprietary/confidential information."  The CIM focuses on the same industries as MSW and stated it planned to acquire "top broker talent."  The offices are in the same locations where MSW has employees, such as Atlanta, Denver (Sparks' residence), and Houston.  Cobbs Allen has no presence in Atlanta or Denver.  See Exhibit E.

57.     On July 12, 2019, Sparks was informed MSW was not going to "invest" in his business as they considered it a direct competitor.  As a result, MSW considered his employment terminated immediately.

58.     Instead of pulling the team together, Sonderman - the second highest ranking leader in FSD - was busy recruiting MSW employees to leave MSW with him.  On July 12, he told one employee that he intended to finish renewal season, get close to clients, get paid and then move the business.

59.     Three days later on July 15, 2019, Tanner resigned and formally joined Cobbs Allen.

60.     Less than a week after Sparks was fired, on July 18, David McMahan resigned and formally joined Cobbs Allen.

61.     On Sunday, July 21, 2019 at approximately 3:00 p.m. CST, during a call with Rick Ulmer, Sonderman resigned. Upon receiving Sonderman's resignation, Rick Ulmer reminded him of his Employment Agreement and specifically instructed Sonderman not to return to the office.

62.     A key card access report shows Sonderman entered the MSW office in Atlanta at approximately 5:30 p.m. CST - on Sunday, July 21st. While in the office, Sonderman deleted all of his emails and files from his work laptop. Security watched Sonderman leave with boxes.

63.     The very next day, on July 22, 2019, Sonderman called one of MSW's clients. During the call, Sonderman told the client that his new firm could offer better services.

64.     Sonderman also contacted another client and told her that he had left MSW. The client was clear: she was not going to move the account to him.

65.     Upon information and belief, Sonderman, Tanner, Sparks and McMahan continue to solicit MSW's clients to this very day. Further, they are continuing to persuade, and are trying to persuade, MSW's employees to leave.

66.     To date, a total of 7 employees have either resigned or left MSW and joined Defendants to work for Cobbs Allen.

67.     In the highly competitive insurance industry, the loss of these executives will lead to lost profits and lost customers.

4811-2951-2093
5023063-101716

68.     Although cease and desist letters were sent to all Defendants asking them to return any confidential information and stop their misconduct, they have refused.[4]

## V.     CAUSES OF ACTION

### COUNT I

### TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

69.     MSW is suffering and will continue to suffer immediate and irreparable harm and injury if Defendants use any of MSW's confidential, proprietary, and trade secret information, including customer lists, sales lists, pricing lists, agreements, and business practices, that they acquired during their employment with MSW.  Defendants' actions will result in the loss of customers to its competitor.  The disclosure of the confidential, proprietary, and trade secret information will give MSW's competitor an unfair advantage and the opportunity to undercut it.

70.     Further, the non-solicitation provisions of the agreements are due to be enforced because they reasonably protect MSW's customer relationships, employee relationships and business interests.  MSW possesses a protectable interest in its customers, employees, and the confidentiality and non-solicitation provisions are reasonably related to that protectable interest.  MSW's request for

---

[4] Instead, Sonderman filed a state court action in Cobb County. See **Exhibit J**.

4811-2951-2093
5023063-101716

enforcement of the agreements against Defendants is reasonable in time and geographic scope. The enforcement will not cause an undue hardship to Defendants, and the harm to MSW outweighs any harm that might be caused to Defendants if the injunction is granted.

71.     No security or only nominal security should be required with regard to the requested temporary restraining order and preliminary injunction because MSW only seeks to enjoin Defendants from soliciting its customers, its employees and unfairly competing and interfering with MSW by using its confidential, proprietary, and trade secret information to avoid irreparable damage to MSW's business. The Court has discretion to order that only nominal or no security is required.

WHEREFORE, PREMISES CONSIDERED, MSW respectfully requests that the Court enter an order preliminarily and thereafter permanently enjoining Defendants, and those acting in concert with them, from soliciting MSW's customers, employees and misappropriating MSW's confidential, proprietary, and trade secret information, and intentionally interfering with its business relationships. MSW further requests such additional and appropriate relief to which it is entitled.

## COUNT II

## BREACH OF CONTRACT

18

72.    MSW and Defendants had contractual agreements whereby Defendants agreed not to solicit MSW's customers or employees and promised to maintain and protect MSW's confidential, proprietary, and trade secret information.  They also agreed to devote all of their time and attention to MSW. Instead, they were plotting to compete.

73.    MSW performed its obligations that were not otherwise made impossible or impracticable.

74.    Defendants breached their duties on multiple occasions by soliciting employees, soliciting customers, using confidential, proprietary, and trade secret information, and breaching their duty of loyalty.

75.    Despite requests to cease and desist, Defendants have refused.  MSW continues to be damaged by their breach.

WHEREFORE, PREMISES CONSIDERED, MSW respectfully requests compensatory and consequential damages resulting from Defendants' breach, injunctive relief to prevent any further breaches, punitive damages, attorneys' fees, costs, and any other relief to which MSW is entitled.

## COUNT III

## INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS

76.    Each of the Defendants was in an Executive leadership role with MSW and as a result they were aware of MSW's business relationships with its

existing and potential customers.  They all had substantial books of business.  They also have worked with MSW for many years and know its employees, their salaries and confidential personnel information about them.

77.    Defendants have intentionally interfered with MSW's business relationships and will continue to do so.

78.    Defendants' tortious interference with MSW's contractual and business relationships has caused and will continue to cause MSW immediate and irreparable harm.

WHEREFORE, PREMISES CONSIDERED, MSW respectfully requests compensatory and consequential damages resulting from Defendants' tortious acts, injunctive relief to prevent any further interference, punitive damages, attorneys' fees, costs, and any other relief to which MSW is entitled.

## COUNT IV

### BREACH OF FIDUCIARY DUTY

79.    As part of the Executive leadership at MSW, Defendants owed a duty to MSW to act with due regard to its interests and with utmost good faith and loyalty. See *Williams v. Williams*, 497 So. 2d 481, 483 (Ala. 1986).  This duty required them to, among other things, not act in any manner adverse to MSW's interests.

4811-2951-2093
5023063-101716

80.    Defendants breached the duty of loyalty they owed to MSW by assisting Cobbs Allen to develop a division that is identical to the services offered by MSW.  They also encouraged dissent within MSW to harm MSW.  All the while, Defendants cashed their MSW pay checks.

81.    As a result of Defendants' breach of fiduciary duties, MSW has been damaged and will continue to be damaged.

WHEREFORE, PREMISES CONSIDERED, MSW respectfully requests compensatory and consequential damages resulting from Defendants' tortious acts, punitive damages, attorneys' fees, costs, and any other relief to which MSW is entitled.

## COUNT V

## CONSPIRACY TO INTERFERE WITH BUSINESS RELATIONS

82.    Defendants and others were present, encouraged, aided, abetted, assisted, paid money to, or were ready to aid, abet, or assist  others in interfering with the MSW employment agreements and customer relationships.

83.    Defendants agreed to systematically go after MSW's employees and customers to undermine MSW.  These actions were part of Defendants' conspiracy to weaken MSW, create and grow Cobbs Allen, and increase their compensation.

84.    Defendants' conspiracy has caused MSW to incur significant and ongoing damages.

4811-2951-2093
5023063-101716

WHEREFORE, PREMISES CONSIDERED, MSW respectfully requests compensatory and consequential damages resulting from Defendants' tortious acts, injunctive relief to prevent any further misuse, punitive damages, attorneys' fees, costs, and any other relief to which MSW is entitled.

MSW demands a jury to try all claims.

## VI.   PRAYER FOR RELIEF

Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

*s/ Jenna M. Bedsole*
JENNA M. BEDSOLE
DAISY C. KARLSON
Attorneys for Plaintiff

OF COUNSEL
BAKER DONELSON BEARMAN
 CALDWELL & BERKOWITZ, P.C.
420 20th Street North, Suite 1400
Birmingham, Alabama 35203
Tel. 205-326-0480

4811-2951-2093
5023063-101716

## **VERIFICATION**

With full authority, the undersigned, Frederick W. Ulmer, III, who is the Co-Vice Chairman of McGriff, Seibels, & Williams, Inc., and personally familiar with the allegations in this Complaint, hereby declares under penalty of perjury that the foregoing is true and correct.  Executed on this day July 26, 2019.

4811-2951-2093

5023063-101716

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served upon the following counsel of record by Certified Mail and/or by electronically filing the foregoing with the Clerk of Court using the Ala-file electronic filing system, on this the 26th day of July, 2019.

Charles L. Bachman, Jr.
Todd E. Hatcher
Joseph D. Shelley
GREGORY, DOYLE, CALHOUN &
ROGERS, LLC
49 Atlanta Street
Marietta, Georgia  30060

*Attorneys for Darren Sonderman*

John Tanner
359 Anderwood Ridge, NW
Marietta, GA 30064

*Via Certified Mail*

Paul Sparks
820 Gaylord Street
Denver, CO 80206

*Via Certified Mail*

David McMahan
5590 Lake Island Drive
Atlanta, GA 30327

*Via Certified Mail*

*s/ Jenna M. Bedsole*
Of Counsel

24