# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| **McGRIFF SEIBELS & WILLIAMS, INC.,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:19-cv-1196-ACA** |
| | } | |
| **PAUL SPARKS, DARREN SONDERMAN, DAVID McMAHAN, JOHN TANNER, and J. GREGORY McCOLLISTER,** | } | |
| | } | |
| **Defendants.** | } | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case is before the court on Plaintiff McGriff, Seibels & Williams, Inc.'s ("MSW") request for a preliminary injunction. (Doc. 11 at ¶¶ 81–83; Doc. 12).

Defendants Paul Sparks, Darren Sonderman, David McMahan, John Tanner, and J. Gregory McCollister previously worked for MSW in MSW's Financial Services Division. Defendants now work for a MSW competitor. MSW alleges that Defendants have tortiously interfered with its business relations and breached the terms of their employment agreements with MSW by soliciting MSW clients and employees and using MSW's confidential information.

In its amended verified complaint, MSW asserts state law claims against Defendants for breach of contract, tortious interference with business relations, breach of fiduciary duty, and conspiracy to interfere with business relations. (Doc. 11). MSW seeks a preliminary injunction enjoining and restraining Defendants from soliciting MSW's customers and employees; misappropriating MSW's confidential, proprietary, and trade secret information; and intentionally interfering with MSW's business relationships. (Doc. 11 at 21; *see also* Doc. 12).

The court held a hearing on MSW's request for a preliminary injunction. Having considered the entire record in this case, including the evidence presented at the hearing and the parties' briefs, the court **DENIES** MSW's request for a preliminary injunction.

## I.    RELEVANT FACTS

MSW's amended verified complaint sets out its version of the facts supporting its request for the extraordinary remedy of a preliminary injunction. To hear MSW tell the tale, two of its former employees, Defendants Paul Sparks and Darren Sonderman, plotted to willfully violate their employment agreements with MSW by creating a new insurance broker (called CAC Specialty) directly in competition with MSW. (Doc. 11 at ¶ 38). As part of the "conspiracy," Messrs. Sparks and Sonderman allegedly isolated loyal MSW employees from valuable MSW clients in order to lure those clients away from MSW. (*Id.* at ¶ 39). They—

along with the other Defendants—also allegedly solicited MSW's best employees to leave the company and used MSW's confidential, proprietary, and trade secret information to give their new company an unfair advantage and to undercut MSW. (*Id.* at ¶¶ 54, 66, 81).

Based on these verified allegations, the court granted MSW's August 14, 2019 request for a temporary restraining order in part and restrained Messrs. Sparks, Sonderman, and McCollister from directly or indirectly soliciting a number of identified clients or prospective clients of MSW, from directly or indirectly inducing any MSW employee to leave MSW, and from interfering with MSW's business relationships. (Doc. 21 at 6). The court also set a hearing on MSW's request for a preliminary injunction. (Doc. 19).

Beginning on August 26, 2019 and continuing over the course of the following four days, the parties presented the court with evidence relating to MSW's motion for a preliminary injunction. The evidence does not bear out MSW's version of events. Although not directly relevant to the issue of whether Defendants breached their employment agreements, the court finds that the historic background of CAC is critical to understanding the facts giving rise to the lawsuit. For that purpose, its history is included for context followed by the facts directly related to the Defendants' alleged breach of their employment agreement.

A. The Creation of CAC

1. A "Cool Opportunity"

Bruce Denson, Jr. is the President and Chief Operating Officer of Cobbs Allen & Hall ("Cobbs Allen"), an insurance broker that competes with MSW. (Doc. 11 at ¶ 3). Over two years ago, Mr. Denson began working on the general concept of a specialty insurance broker and started recruiting potential employees. (Tr. at 431).

Mr. Denson spotted an opening for the specialty brokerage in September 2018, when two insurance brokerage firms—Marsh and JLT— merged. (Tr. at 432, 547). Mr. Denson suspected that JLT employees might be looking for an opportunity to work somewhere else post-merger. (Tr. at 547). Based on that hunch, Mr. Denson began a targeted recruiting effort focused on former JLT employees. (Tr. at 547).

Cobbs Allen recruited outside of JLT as well. (Tr. at 433). Mr. Denson soon discovered a pattern of discontent among MSW employees. (Tr. at 436). Mr. Denson believed that this discontent might make MSW a fertile recruiting ground for Cobbs Allen and began communicating with MSW employees in the fall of 2018. (Tr. at 436, 567). Although generally discontented, none of the MSW employees seemed interested in the idea of CAC. That began to change in

February 2019, when MSW's parent company, BB&T, announced a merger of equals with SunTrust Bank. (Tr. at 12).

In late February 2019, Cobbs Allen contacted Defendant Paul Sparks on the recommendation of one of Mr. Sparks' friends and colleagues. (Tr. at 187). At the time, Mr. Sparks was the Senior Executive Vice President of MSW responsible for the overall leadership of MSW's Financial Services Department. (Doc 11. at ¶ 13). Mr. Sparks, at Cobbs Allen's invitation, went to dinner with Mr. Denson to discuss a "cool opportunity" that Cobbs Allen was trying to put together. (Tr. at 193). Mr. Sparks invited MSW's claims counsel, Defendant John Tanner, to join them for dinner. (Tr. at 194).

At the dinner, Mr. Denson pitched the idea of a specialty brokerage. During the conversation, Mr. Sparks echoed the concerns Mr. Denson had heard about MSW from other MSW employees. (Tr. at 195). But, Mr. Sparks left the dinner unconvinced that Cobbs Allen's proposed venture would ever work and wished Mr. Denson good luck. (Tr. at 194, 197). Undeterred by Mr. Sparks' lack of enthusiasm, Mr. Denson continued to recruit Mr. Sparks throughout the spring.[1] (Tr. at 213).

---

[1] Mr. Sparks did not invite Mr. Tanner to any subsequent meetings because he "didn't think it was appropriate to take somebody who worked for me to a meeting that I may decide I want to do something with this company." (Tr. at 199).

## 2. *The Pitch*

Mr. Sparks was not the only MSW employee who met with Mr. Denson in the spring of 2019. Mr. Denson independently reached out to a significant number of MSW employees, including all of the other defendants. (*See e.g.,* Tr. at 440, 445, 447, 457-58, 499, 501, 504, 523). Unfortunately for Mr. Denson, they like Mr. Sparks, expressed skepticism about the proposed venture. Regardless, Mr. Denson persisted with all of his MSW recruits all the while fine tuning the business model for CAC.

There is no secret formula for recruiting. According to Mr. Sparks, if you are looking for the top producers in a particular insurance line, you call companies to see who represents them and underwriters to ask them to identify the big producers at a specific firm. (Tr. at 119, 212) Or, if you have experience in that specific field, you know the top people in the industry based on their reputation. (Tr. at 211). Armed with general information about the top producers in the industry, Mr. Denson went after them.

Mr. Denson selected the people he was interested in recruiting and reached out to most of them through LinkedIn (tr. at 496, 523), a professional networking website. If the recruit responded to his connection request, Mr. Denson would meet the individual and pitch the concept—and the opportunities for ownership— to them. (Tr. at 527-28). In these meetings, people would either offer information

about their current salary or Mr. Denson would ask.  (Tr. at 510, 528).  They might also speak generally about the clients they served and the amount of new business they brought in annually.  (Tr. at 396-97).  None of these individuals provided a list of their clients.  (Tr. at 466).

Diligently and relentlessly, Mr. Denson recruited the top producers from two larger insurance brokers at a time when those brokers were left vulnerable by a merger. All told, and over the span of two years, Mr. Denson reached out to hundreds of people within the insurance industry in an attempt to recruit them to the new venture.  (Tr. at 503).  At least 40 of those people were MSW employees. (Tr. at 524).

### 3. The Sale

Mr. Sparks became intrigued with Cobbs Allen's idea and met with Mr. Denson and Jack Leventhal, Mr. Denson's banking partner, several times between March and July.  (Tr. at 200). The purpose of the meetings was to flesh out a general, workable concept of the new business.  (Tr. at 200, 434). The men collaborated on how to structure the company, how to recruit JLT employees and other industry talent, and how to capitalize on being a "really unique specialty broker."  (Tr. at 200).  Finally, the specialty brokerage came to fruition as CAC Specialty, an affiliate of Cobbs Allen.  (Tr. at 427).

Mr. Sparks left MSW in July (tr. 205) and was the first person to sign on to work for CAC (tr. at 560). Having someone with Mr. Sparks' ability and stature in the insurance industry sign on to CAC was a game changer. (Tr. at 560). According to Mr. Denson, Mr. Sparks' decision to join CAC was "absolutely" important to CAC's ability to close the deal with JLT employees. (Tr. at 561). It also naturally had an impact on MSW employees' decision on whether to join CAC. (Tr. at 603). Once Mr. Sparks signed on, Mr. Denson wasn't just calling people; people were calling him. (Tr. at 561). According to Mr. Denson, the number of potential recruits reaching out to him after hearing Mr. Sparks joined CAC "has gone through the roof." (*Id.*).

Within two weeks of Mr. Sparks' departure from MSW, a number of JLT employees signed on to join Mr. Sparks at CAC. So too did Messrs. Sonderman, McCollister, Tanner, and McMahan. (Tr. at 153, 261, 306, 411). In addition to Defendants, eight other MSW employees left for CAC within a month of Mr. Sparks' departure from MSW. (Tr. at 494).

B. The MSW Employment Agreements

All Defendants executed restrictive covenants ("Agreements") with MSW. (Pl. Exs. 1–5). Messrs. Sonderman, Sparks, Tanner, and McCollister executed a Nonpiracy and Covenant Not to Compete restricting them from contacting, soliciting, making sales to, or attempting to procure business from any MSW

clients or prospective clients located in nine states: Georgia, Florida, Alabama, Mississippi, Texas, Tennessee, Louisiana, South Carolina, and North Carolina (the "Southeast"). (Pl. Exs. 1, 2, 4, 5).

Mr. McMahan's executed an Employment Agreement restricting him from soliciting, diverting, or taking away or attempting to solicit, divert, or take away clients or prospective clients with which he or MSW had had contact for some period of time prior to his departure from MSW. (Pl. Ex. 3).

All Defendants agreed not to solicit—directly or indirectly—MSW employees to leave MSW or use or disclose MSW's confidential information in subsequent employment. (Pl. Exs. 1–5).

MSW contends that Defendants breached their Agreements and interfered with MSW's business relationships. The court examines the evidence (or lack thereof) in support of those claims below.

### 1. *Defendants' Contact with MSW Clients in the Southeast*

MSW alleges that Defendants contacted various MSW clients in the Southeast in violation of their Agreements and in tortious interference with its business relationships. The court addresses each Defendant in turn.

### a. **Mr. Sonderman**

Mr. Sonderman contacted four MSW clients located in the Southeast. The first is Synovus. According to Mr. Sonderman, he and Mr. Sparks jointly managed

the Synovus account.  The week before Mr. Sparks left MSW, Messrs. Sonderman and Sparks had gone through the preliminary stages of renewing Synovus's insurance.  After Mr. Sparks resigned and Mr. Sonderman had decided to leave MSW—but before he actually left—he reached out to Synovus to inform it that Mr. Sparks had retired.  (Tr. at 124).

Mr. Sonderman denies that he solicited Synovus after he left MSW, but MSW alleges Mr. Sonderman solicited Synovus by contacting Synovus twice after his resignation.  MSW's only support for this allegation is two statements made through three levels of hearsay.[2]  First, Dusten Cahill, a current MSW employee, testified that Ryan Harrison (another MSW employee) stated that a Synovus contact had stated that Mr. Sonderman was "pushing hard for a meeting."  (Tr. at 51).  Second, Mr. Cahill testified that Mr. Harrison also told him that another Synovus contact said that Mr. Sonderman had left several voice messages and sent a text message indicating that he wanted to discuss "banking relationships" with CAC.  (*Id.*).

---

[2] The court may consider hearsay testimony in deciding a motion for a preliminary injunction.  *Levi Strauss & Co. v. Sunrise Intern. Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) ("At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'") (quoting *Asseo v. Pan Am. Gran Co.*, 805 F.2d 23, 26 (1st Cir. 1986)).  In the interest of completeness, the court describes the hearsay testimony, but as explained below, the court gives little credence to that testimony.  To be clear, the court does not find as a fact that Mr. Sonderman contacted Synovus after his resignation from MSW based on this hearsay testimony.

Mr. Sonderman also contacted First US Bancshares, McWane, Inc., and Regions Financial Corporation, all of which are based in Alabama. Mr. Sonderman testified that since his resignation, he has had limited contact with each of them. Mr. Sonderman told First US Bancshares that he had left MSW, but he testified that he did not solicit its business and did not express frustrations with MSW. (Tr. at 126). When Mr. Sonderman called McWane, he learned that MSW had already contacted McWane to inform it that Mr. Sonderman left, and MSW intended to re-staff the account. (Tr. at 127). However, McWane informed MSW that it was "probably going to follow [Mr. Sonderman] wherever he goes next." (Tr. at 127). Finally, Mr. Sonderman called Regions to apologize for leaving MSW two days before Regions' renewal meetings with MSW. (Tr. at 128). MSW did not present any testimony to refute Mr. Sonderman's account of his conversations with those clients.

### b. Mr. Sparks

After his retirement from MSW, Mr. Sparks had discussions with two MSW clients in the Southeast. Those clients are Synovus Bank and Southern Company. (Tr. at 218, 225).

Mr. Sparks called his contact at Synovus Bank to apologize for not telling her when he last saw her that he would be leaving MSW the next day. (Tr. at 218). During that call, Mr. Sparks assured Synovus that it had "a great team of people" at

MSW. (*Id.*). Mr. Sparks believes he told his client contact about the general structure of CAC's business model, but he did not tell Synovus that he could offer better services through CAC. (Tr. at 228). MSW's only evidence to the contrary is, again, buried under three levels of hearsay. Mr. Cahill testified that Mr. Harrison said that Mr. Sparks had told his Synovus contact that (1) everyone at MSW was miserable and (2) Mr. Sparks would not be surprised if the entire team was gone by the time Synovus renewed for the following year, and he was going to CAC which could provide all the same products that MSW provides. (Tr. at 58).[3]

Mr. Sparks also had breakfast with Southern Company's Risk Manager, who is a personal friend of Mr. Sparks. (Tr. at 226). Mr. McCollister attended the breakfast as well. Southern Company is a Georgia-based account. (Pl. Ex. 45). During this meeting, Mr. Sparks testified that the client asked about CAC, and Mr. Sparks gave her information about the new company. (Tr. at 226). Mr. Sparks told the client that he had a non-solicitation covenant in his MSW Agreement, and he intended to honor it. (*Id.*). According to Mr. Sparks, he did not discuss moving Southern Company's business to CAC or provide details on how Southern Company could do so. (Tr. at 227). MSW has not presented any evidence to refute Mr. Sparks' account of that conversation.

---

[3] *See supra* n.2.

### c.    Mr. Tanner

There is no evidence that Mr. Tanner communicated in any way with MSW clients in the Southeast after his resignation.

### d.    Mr. McCollister

After he resigned, Mr. McCollister communicated with one MSW client in the Southeast:  Southern Company. (Tr. at 407).  As previously stated, Mr. McCollister attended Mr. Sparks' breakfast meeting with the Southern Company's Risk Manager.  (Tr. at 412).  Prior to that meeting, however, Mr. McCollister called the Risk Manager to tell her that he left MSW, but he had a non-solicitation agreement that applied to her.  (*Id.*).  According to Mr. McCollister, the Risk Manager simply wished him luck in his new endeavor.  (Tr. at 412).

### e.    Mr. McMahan

Mr. McMahan communicated with three of his MSW clients before and after his resignation.  First, on the day before he resigned, Mr. McMahan conducted a prescheduled call with his contact at Ocwen. (Tr. at 365).  The Ocwen representative gave Mr. McMahan some information on how Ocwen was going to pursue its renewal.  (*Id.*).  Mr. McMahan then informed him that he was leaving MSW but would be sure to connect him with someone else at MSW to "ensure that he had a successful renewal process."  (*Id.*).

Since his resignation from MSW, Mr. McMahan has contacted two of his MSW accounts: Rayonier and Mohawk. (Tr. at 354). Mr. McMahan informed both Rayonier and Mohawk that he had left MSW, that he had a nonsolicitation agreement, and that he could not solicit their business. (Tr. at 360–361). In the case of Mohawk, Mr. McMahan reached out to Mohawk only after a charitable donation he made on MSW's behalf was returned, which necessitated Mr. McMahan's call to explain he was no longer at MSW. (Tr. at 361).

In addition to these few direct contacts, Mr. McMahan sent a "blast email" to a number of individuals explaining that Mr. McMahan had joined CAC Specialty. (Tr. at 357). The email outlined the new firm and contained a link to CAC's website but did not discuss in detail what services CAC could offer. (*Id.*). Based on the evidence presented, Rayonier is the only MSW client who received the email. (Tr. at 356-58).

### 2. *Defendants' Contact with MSW Clients Outside the Southeast*

In addition to contact with MSW clients in the Southeast, MSW contends that Defendants' have contacted other MSW clients, all resulting in tortious interference with its business relationships. The court addresses each Defendant separately below and then reviews what other evidence MSW presented in support of its tortious interference claim.

### a. Mr. Sonderman

After he resigned, Mr. Sonderman called Hawaiian Electric to explain that he was no longer at MSW. (Tr. at 129). Mr. Sonderman did not discuss CAC services with Hawaiian Electric but told the client that he hoped when the time was right, they could continue to work together. (*Id.*).

Mr. Sonderman also met with Major League Baseball and Alvarez & Marsal in New York to discuss CAC services. (Tr. 242–243, 293).

### b. Mr. Sparks

Six MSW clients contacted Mr. Sparks after MSW announced he had left the company. All six of the clients are located outside the Southeastern region. Those clients include: Major League Baseball, Alvarez & Marsal, Magellan, Williams Companies, Dominion Energy, and AEP Corporation. (Tr. at 219). During his conversations with these clients, Mr. Sparks told them that he was leaving to work for a new specialty broker and that he hoped to have an opportunity to connect with those clients to "chat" about the new business one day. (*See* Tr. at 220–21). Mr. Sparks is sure he told at least some of these clients that he is subject to restrictive covenants contained in his Agreement. (Tr. at 223–24).

Mr. Sparks attended the Major League Baseball and Alvarez & Marsal meetings with Mr. Sonderman. (Tr. 242–243, 293).

### c. Mr. Tanner

Mr. Tanner attended the Major League Baseball and Alvarez & Marsal meetings with Mr. Sonderman and Mr. Sparks. (Tr. 242–243, 293).

### d. Mr. McCollister

After he resigned, Mr. McCollister communicated with two MSW clients outside the Southeast: Southwest Gas and DTE Energy. (Tr. at 407). Mr. McCollister told a Southern Gas representative that he was working for CAC and would like to get together to discuss CAC. (Tr. at 411). Mr. McCollister sent a press release announcing the formation of CAC to DTE Energy. (Tr. at 413).

### e. Mr. McMahan

There is no evidence that Mr. McMahan contacted clients outside the scope of his Agreement.

### f. Client Accounts Lost Since Defendants' Departure

MSW has established that since Defendants' departure from MSW, MSW has lost three client accounts: MedNax, TrueEX, and trueDigital. (Tr. at 63). All of these clients are outside the Southeastern region.

MedNax was Mr. Sparks' client while he worked at MSW. (Pl. Ex. 45). Mr. Sparks had no role in MedNax's decision to move its business to CAC. (Tr. at 247). A MedNax executive is friends with one of the JLT employees who now

works at CAC, and MedNax moved its business to CAC because of that connection. (*Id.*).

MSW has presented no evidence linking TrueEX and trueDigital's decision to move its business to any of the Defendants. There is no evidence any Defendant has been in contact with these clients.

### g.  Miscellaneous Evidence on Tortious Interference

Through Mr. Cahill, MSW presented evidence that near the end of Mr. Sparks' tenure with MSW, someone told Mr. Harrison not to attend a board meeting at Synovus. (Tr. at 44–46). But the undisputed testimony is neither Mr. Sparks nor Mr. Sonderman staffed more than two MSW employees to attend board meetings at Synovus, and Synovus told Mr. Sparks that three people were not needed. (Tr. at 159).

### 3.  *Defendants' Solicitation of MSW Employees*

MSW alleges that each Defendant violated an agreement not to solicit other MSW employees to leave the company. The court will address each Defendant separately.

### a.  Mr. Sonderman

Mr. Sonderman spoke with Mr. Sparks about the new business before he discussed it with the other Defendants. (Tr. at 98). Later, he took a business trip with three MSW employees, including Dusten Cahill, whom Mr. Sonderman

supervised. (Tr. at 10). On the trip home, the four men discussed their shared concerns about BB&T's ownership of MSW and the possibility of the company being sold after the merger. (Tr. at 12). Mr. Sonderman mentioned that he and Mr. Sparks knew others in the industry that were looking to leave their current employers, and that this could be an opportunity to team up with others who liked the idea of an employee owned specialty broker. (Tr. at 14). The undisputed evidence is that Mr. Sonderman did not discuss CAC or Cobbs Allen, and he did not ask the employees to leave MSW. (*Id.*). In fact, Mr. Sonderman mentioned the possibility that MSW would have an affiliation with CAC if it wanted to invest. (Tr. at 14).

After these initial discussions, Mr. Sonderman took Mr. Cahill to lunch on June 5, 2019 to give him more details about CAC. (Tr. at 16). During this lunch, Mr. Sonderman told Mr. Cahill that he was serious about separating from MSW and joining CAC. (Doc. 11 at ¶¶ 41, 46; Doc. 20-1 at ¶ 9; Tr. at 16). Mr. Sonderman emphasized that CAC employees would have equity in the company that could be worth $5 million or more to Mr. Cahill. (Tr. at 17, 28). Shortly thereafter, Mr. Cahill received a LinkedIn request from Mr. Denson and asked Mr. Sonderman whether it was related to their discussion at lunch. (Tr. at 19). Mr. Cahill testified that Mr. Sonderman responded "'yeah, accept that,' and 'you should talk to him.'" (Tr. at 19).

Mr. Sonderman testified that he spoke to other MSW employees if they came and asked him questions. (Tr. at 108). In every discussion, Mr. Sonderman told the employee "you've got to do what is right for you and your family." (Tr. at 111).

Elizabeth Nichols, a marketing account executive at MSW, testified that she spoke to Mr. Sonderman in late June, and he asked her whether she had spoken to Mr. Denson. (Tr. at 168). Ms. Nichols testified that Mr. Sonderman told her to "connect with" Mr. Denson. (*Id.*). According to Ms. Nichols, Mr. Sonderman called a few weeks later and said he understood that MSW had increased her pay. (Tr. at 174). Mr. Sonderman told her to remember "it's still MSW" and MSW is still "part of the bank." (*Id.*). After he resigned, Mr. Sonderman contacted Ms. Nichols to apologize that the situation had become so polarizing. (Tr. at 154, 177-78). They did not discuss CAC during that phone call. (Tr. at 178).

On July 8, 2019, Mr. Cahill, Mr. McMahan, and another MSW employee requested and had a meeting with Mr. Sonderman. (Tr. at 43, 321). The topic of conversation was the pros and cons of going to CAC or staying at MSW. (Tr. at 322). The men discussed the timing for a potential departure from MSW and whether BB&T might invest in CAC. (Tr. at 43). Mr. Sonderman did not do much of the talking, other than to answer questions that were asked of him. (Tr. at 322-23). Mr. McMahan testified that Mr. Sonderman did not encourage the other men

to leave MSW.  (Tr. at 373).  In fact, Mr. McMahan left MSW before Mr. Sonderman decided to resign.  (Tr. at 335).

### b.    Mr. Sparks

Neither Mr. Sparks nor Mr. Sonderman can recall precisely when they first discussed CAC Specialty with each other.  Mr. Sparks is "sure" he talked to Mr. Sonderman after his April 2019 dinner meeting with Mr. Denson, when Mr. Sparks considered Mr. Denson's idea "a bit of a long shot."  (Tr. at 200–01).  Once Mr. Sparks became interested in the possibility of the new venture, he did not tell Mr. Sonderman about later meetings.  (Tr. at 202).

In early June, some MSW employees attended a recruiting function hosted by Mr. Denson in Denver, Colorado.  (Tr. at 238).  Mr. Sparks did not attend the function but some MSW employees—including employees who are still with MSW today—let Mr. Sparks know they were in Denver.  (Tr. at 238–39).  Mr. Sparks invited these colleagues to a cocktail party he was hosting already at his house.  There, the MSW employees who attended the Denver meeting talked about the recruiting event.  They relayed little to Mr. Sparks, saying only that the meeting was extremely disorganized and leaving the impression with Mr. Sparks that "it didn't seem to go very well."  (Tr. at 240).

The evidence establishes that aside from the cocktail party, Mr. Sparks had four individual discussions with MSW employees.

In June, after Mr. Denson contacted Mr. McCollister, Mr. Sparks told Mr. McCollister "he might want to" accept Mr. Denson's request to connect because Mr. Denson "is an interesting guy." (Tr. at 389, 392).

In July, Mr. Sparks met with Mr. Cahill after Mr. Cahill had received an offer of employment from CAC. (Tr. at 28, 213). During the meeting, Mr. Sparks shared that he was leaving MSW for CAC partially because of his frustration with MSW leadership and management, the uncertainty about MSW's future considering its merger with SunTrust, and his concerns about MSW's technology and compensation structure. (*See* Tr. at 29-30).

On July 2, 2019, Mr. Sparks had lunch with Mr. McMahan. (Tr. at 315). By this point, Mr. McMahan and another MSW employee had spoken at length about the possibility of joining the new venture. (Tr. at 327–28). At lunch, Mr. Sparks told Mr. McMahan he would be retiring and pursuing another venture. (Tr. at 316, 318). He also told Mr. McMahan that he hoped BB&T would be a part of the new venture. (*Id.*). Mr. Sparks expressed his frustrations with MSW. (Tr. at 320). Mr. McMahan shared those concerns. (Tr. at 321). At no point during this conversation did Mr. Sparks ask Mr. McMahan to leave MSW. (Tr. at 315–16).

Finally, Mr. Sparks spoke with Bain Head, a close personal friend of his who is also employed by MSW. In 2018, after Mr. Denson had already met with Ms. Head about CAC Specialty, Ms. Head suggested that Mr. Denson reach out to

Mr. Sparks. (Tr. at 591). Ms. Head testified that neither Mr. Sparks nor any of the other defendants attempted to recruit her to join CAC. (Tr. at 581). In fact, Mr. Sparks made clear to her that their friendship would endure regardless of where she worked. (*Id.*).

### c. Mr. Tanner

Mr. Tanner approached Ms. Nichols' supervisor to let her and Ms. Nichols know that they were working on a new business venture with Cobbs Allen and to ask whether Ms. Nichols and her supervisor had connected with Mr. Denson. (Tr. at 165, 288). The only other evidence of Mr. Tanner speaking to another MSW employee comes from Ms. Head's testimony. She testified that Mr. Tanner tried to talk her into staying at MSW. (Tr. at 581).

### d. Mr. McCollister

After Messrs. McCollister and Denson connected, Mr. McCollister spoke to two colleagues (who have remained at MSW) about Mr. Denson. One of those individuals later told Mr. McCollister that he and four other MSW employees were considering the new opportunity with CAC. (Tr. at 393–94, 397–98).

### e. Mr. McMahan

There is absolutely no evidence that Mr. McMahan solicited employees to join CAC.

*4.     Defendants' Use of Confidential information*

MSW alleges that Defendants have used confidential, proprietary, and trade secret information.  Once again, the court addresses the evidence with respect to each Defendant separately.

### a.     Mr. Sonderman

On Sunday July 21, 2019, Mr. Sonderman called Rick Ulmer, Chief Executive Officer of Retail Operations for McGriff Insurance Services, and expressed his intention to pursue a new opportunity.  (Tr. at 99).  Mr. Sonderman testified that during this phone call, he asked Mr. Ulmer if the two might be able to negotiate an exit strategy that would allow Mr. Sonderman to help three clients wrap up renewal season so that Mr. Sonderman would not leave those clients in a "tough spot."  (Tr. at 100). Mr. Ulmer told Mr. Sonderman not to come to the office the following day (Monday) because there was going to a "town hall meeting," and the two would continue their conversation on Tuesday.  (*Id.*).  A couple of hours after his conversation with Mr. Ulmer, Mr. Sonderman entered the MSW office in Atlanta.  (Doc. 11 at ¶ 70).  MSW alleges in its amended verified complaint that while in the office, Mr. Sonderman deleted all of his emails and files from his work laptop, and security watched him leave with boxes.  (Doc. 11 at ¶ 70).  Mr. Sonderman disputes this account, and MSW has offered no other evidence to support its accusation.  According to Mr. Sonderman, he took from his

office public filings, two notebooks, some personal files, and a three- or four-page list of "to dos" for the following week that contained MSW client information. (Tr. at 138). There is no evidence that Mr. Sonderman used or disclosed any of this information during his employment with CAC or otherwise.

### b. Mr. Sparks

After MSW terminated Mr. Sparks' employment, and at Mr. Sparks' request, an MSW employee escorted Mr. Sparks into his Atlanta-based office at MSW to return his MSW property and collect his personal belongings. (Tr. at 244–45). Mr. Sparks testified that he left his MSW key card and laptop in the office and did not take any MSW documents with him. (Tr. at 244, 245). There is no evidence Mr. Sparks possesses confidential information, or even if he did, that he has used or disclosed the information.

### c. Mr. Tanner

Mr. Tanner resigned July 23, 2019. (Tr. at 254). When he resigned, Mr. Tanner possessed confidential information from MSW, but he has given that information to his attorney, who has offered to provide it to counsel for MSW. (Tr. at 297–98; Def. Ex. 5). Counsel for the parties have been in the process of negotiating the return of the information, and MSW admits that Defendants have been "cooperative" in that effort. (Doc. 25 at 34–35). There is no evidence that Mr. Tanner used or disclosed any of this information.

### d.  Mr. McCollister

On July 31, 2019, Mr. McCollister resigned and joined CAC.  (Doc. 11 at ¶ 74).  When Mr. McCollister cleaned out his desk at MSW, an MSW executive made sure that Mr. McCollister did not take confidential information.  (Tr. at 401).  Several days later, Mr. McCollister found a two-inch stack of documents in the back of his car that contained a copy of renewal strategy documents for one of MSW's clients.  (Tr. at 401-02.).  Mr. McCollister gave the documents to his attorney who has offered to return them to counsel for MSW.  (Tr. at 402).  There is no evidence that Mr. McCollister used or disclosed any of this information.

### e.  Mr. McMahan

When Mr. McMahan resigned from CAC, he returned his badge, laptop, and company credit card.  (Def. Ex. 4).  MSW let Mr. McMahan keep his cellphone and cellphone number.  (Def. Ex. 4).  When Mr. McMahan realized that MSW had not deleted his MSW email account from his phone, he deleted the account himself.  (Def. Ex. 4).  Mr. McMahan found hard copies of client renewal documents at his house, which he destroyed.  (Def. Ex. 4).  Mr. McMahan also found client renewal documents on his cellphone.  (Tr. at 363-64; Def. Ex. 4).  On July 26, 2019, he offered to return or destroy those documents at the direction of MSW counsel.  (Def. Ex. 4).  During the hearing on MSW's request for a temporary restraining order, MSW's counsel stated that the parties were in

discussions regarding the return of MSW's confidential information but just had not had an opportunity to make the exchange. (Doc. 25 at 34–35). There is no evidence that Mr. McMahan used or disclosed any of this information.

## II. DISCUSSION

MSW seeks a preliminary injunction that would enjoin and restrain Defendants from soliciting MSW's customers and employees; misappropriating MSW's confidential, proprietary, and trade secret information; and intentionally interfering with MSW's business relationships. (Doc. 11 at 21; *see also* Doc. 12).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff must show "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 774 (11th Cir. 2015). The movant bears the burden of persuasion as to all four elements. *Cunningham v. Adams*, 808 F.2d 815, 819 (11th Cir. 1987).

As explained below, MSW has not demonstrated a substantial likelihood of success on the merits of its claims for breach of contract and tortious interference with business relationships.[4]

A. Choice-of-Law

Before the court can address the likelihood of success on the merits, the court must determine what law applies to MSW's claims. "A federal court in a diversity case is required to apply the laws, including principles of conflict of laws, of the state in which the federal court sits." *Colonial Life & Acc. Ins. Co. v. Hartford Fire Ins. Co.*, 358 F.3d 1306, 1308 (11th Cir. 2004) (quotation marks omitted). Therefore, Alabama choice-of-law rules govern the analysis.

*1. Breach of Contract*

The court begins by determining which law governs MSW's breach of contract claim. Alabama applies the doctrine of *lex loci contractus*, which provides that "'a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction.'" *Id.* (quoting *Cherry, Bekaert & Holland v. Brown,* 582 So. 2d 502, 506 (Ala. 1991)). Here, the parties contracted to apply Alabama law. (Pl. Exs. 1–5). The court must analyze whether the parties' "contractual choice-of-law

---

[4] These two claims form the basis of MSW's request for preliminary injunctive relief. (*See generally* Doc. 12, describing conduct that MSW alleges amounts to breach of Defendants' employment agreements and interference with business relationships).

clause is enforceable by reference to the Second Restatement of Conflicts §§ 187–88." *DJR Associates, LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1222 (N.D. Ala. 2017) (quotation marks omitted).

Section 187 of the Restatement provides for the application of the laws of the state chosen by the parties where the parties have either a substantial relationship with that state or another reasonable basis for their choice. There are exceptions to this rule where the "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties." Restatement (Second) of Conflict of Laws § 187(2)(b).

Georgia has a relationship with the parties and the contract. The Agreements signed by Mr. Sparks, Mr. Sonderman, Mr. McCollister, and Mr. Tanner state that they were "entered into" in Birmingham, Alabama. (Doc. 11-6 at 2, 6; Doc. 11-7 at 2; 11-8 at 2; Pl. Exs. 1, 2, 4, 5). However, the evidence during the preliminary injunction hearing demonstrates that these Defendants signed their Agreements in Georgia. (Tr. at 143–44, 246, 261, 299, 421). Mr. McMahan's Agreement does not explicitly state where it was executed, but Mr. McMahan testified he signed his Agreement in Georgia. (Tr. at 370).

Alabama also has a relationship to the parties and the contract. And the court find that scales tip in favor of Alabama because its relationship to the parties and contract is more substantial than Georgia. Defendants were hired by an Alabama company, the company is headquartered in Alabama, and the Defendants serviced Alabama-based clients and attended business meetings in Alabama. Therefore, Alabama law governs the dispute unless the exception applies.

To determine whether the exception applies, the court asks: "(1) is there another state with a 'materially greater interest' in the 'determination of the particular issue'; (2) is Alabama's law, as the chosen state, contrary to the 'fundamental policy' of such other state; and (3) would the law of the other state be the applicable law under the rule of § 188 of the Restatement?" *DJR Assocs.*, 241 F. Supp. 3d at 1223; *see also* Restatement (Second) of Conflict of Laws § 187 cmt. g (1971). MSW's motion for a preliminary injunction on its breach of contract claim raises three distinct contractual issues: (1) whether Defendants should be enjoined from soliciting MSW clients and prospective clients; (2) whether Defendants should be enjoined from soliciting MSW employees; and (3) whether Defendants should be enjoined from using confidential proprietary information and trade secrets. The court must determine whether Georgia has a materially greater interest with respect to each "particular" issue. *DJR Assocs.*, 241 F. Supp. 3d at 1223–25. The court finds that it does not.

First, with respect to non-solicitation of MSW employees and misuse of MSW's confidential information, the court concludes that Georgia has little to no interest in protecting an Alabama-based company from being harmed by the loss of employees and the misappropriation of private business information and trade secrets. *See id.* at 1225 ("The use of private, confidential information obtained from a competitor creates an unfair competitive advantage, and Alabama has a great interest in protecting Alabama businesses from being subjected to such unfair competitive disadvantages."). Indeed, Defendants make no specific argument to the contrary. (*See generally* Doc. 30 at 19–20).

Second, with respect to non-solicitation of MSW clients and prospective clients, the court cannot find on the record before it that Georgia has a materially greater interest than Alabama in the determination of this issue.

MSW is an Alabama corporation. (Doc. 11 at ¶ 2). Defendants received production credit for 17 Alabama accounts. (Pl. Exs. 30, 45–48). Defendants traveled to Alabama for client meetings and other MSW business. (Tr. at 160–61, 299, 302). Thus, Alabama has an interest in whether Defendants can solicit MSW clients and prospective clients.

Georgia also has an interest in the enforceability of the non-solicitation provisions of the Agreements. Defendants executed the contracts in Georgia. (Tr. at 143–44, 246, 261, 299, 370, 421). During their employment, Messrs.

Sonderman, McCollister, Tanner, and McMahan lived in Georgia and were based in MSW's Georgia offices.  (Tr. at 86, 143, 298, 369–70, 420).[5]  While employed with MSW, about 25% of Defendants' accounts were Georgia-based.  (Pl. Exs. 30, 45–48).

Although Defendants lived in Georgia and worked out of MSW's Georgia office, and although Defendants signed their Agreements in Georgia, the relationship between MSW and Defendants embodied in the contracts did not focus exclusively—or even primarily—on Georgia.  In addition to their Alabama and Georgia accounts, Defendants had significant customer contacts scattered across multiple states.  Notably, of the 95 accounts Defendants serviced, 17 were based in Florida, and 32 were based in Texas.  (Pl. Exs. 30, 45–48).  Therefore, the non-solicitation covenant impacts several states.  Because multiple states, including Alabama and Georgia, have an interest in determination of the enforceability of the covenant not to solicit MSW clients and prospective clients, the court cannot find that Georgia has a materially greater interest than Alabama in resolution of the issue.  Accordingly, Alabama law applies.  *See Nordson Corp. v. Plasschaert*, 674 F.2d 1371, 1376 (11th Cir. 1982) (noting that the court should

---

[5] For nearly his entire 20-year career with MSW, Mr. Sparks lived and worked full time from Georgia.  (Tr. at 246).  Although he now lives in Colorado, Mr. Sparks still maintains a residence in Georgia.  (Tr. 235–36).  Therefore, the court has not considered Mr. Sparks' contacts with the various states for purposes of this analysis; however, even if the court did weigh Mr. Sparks' connection with Georgia, the outcome would not change.

defer to parties' choice of law if that choice has a reasonable basis where multiple states have an interest in the dispute and no state has a "materially greater interest" in the controversy than another state); *cf. DJR Assocs.*, 241 F. Supp. 2d at 1224 (finding that Georgia had a materially greater interest in the particular issue of a non-compete covenant in part because "the economic relationships the non-compete covenant has impacted for purposes of [the] motion for a preliminary injunction are entirely in Georgia," and because the former employee and all of the customers he sought to service were located in Georgia).

## 2. Tortious Interference

Under Alabama's choice of law rules, "[i]t is well settled that the traditional conflict rule of lex loci delicti applies to tort actions." *Norris v. Taylor*, 460 So. 2d 151, 152 (Ala. 1984).[6]  "Under this principle, an Alabama court will determine the substantive rights of an injured party according to the law of the state where the injury occurred." *Id.*  For financial injuries, courts have recognized that financial injury occurs where the injured party resides. *Chambers v. Cooney*, 2007 WL 2493682, at *11 (S.D. Ala. Aug. 29, 2007).  Because MSW is an Alabama

---

[6] The court also could look to the Agreements to determine whether the Alabama choice of law provision encompasses related tort claims. *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.,* 341 F.3d 1292, 1300–01 (11th Cir. 2003).  In this case, the court need not undertake that analysis because state chosen by the parties is the same state where the injury occurred.

business, the alleged financial injury occurred in Alabama. Accordingly, Alabama law also governs MSW's claim for tortious interference with business relations.

B. Application of Alabama Law to MSW's Claims

*1. Breach of Contract*

MSW contends that Defendants breached their Agreements by soliciting MSW's clients and employees and by using confidential information and trade secrets. (Doc. 11 at ¶¶ 84, 86). The relief MSW seeks has been a moving target throughout these proceedings. In its amended verified complaint, MSW seeks a preliminary injunction enjoining Defendants from "soliciting MSW's customers [and] employees." (Doc. 11 at 21). The request contained in MSW's motion for a temporary restraining order and preliminary injunction is much broader in scope. There, MSW seeks an order restraining Defendants from, among other things, "directly or indirectly, on their own behalf or on behalf of their new employer, soliciting, making sales to or attempting to procure business from any client or prospective client of MSW." (Doc. 12 at 9). At the hearing on MSW's motion for a temporary restraining order, however, MSW characterized the Agreements as "simply . . . nonsolicitation" and stated that they only wanted to enjoin the Defendants from talking to any of MSW's clients that they worked with at the time the Defendants were employed at MSW. (Doc. 25 at 13). Then, in its brief in support of the motion for a preliminary injunction, MSW states that the

Agreements only prohibit Defendants "from soliciting *their* former (as opposed to MSW's) clients" in nine states. (Doc. 31 at 32-33). In the interest of covering all of MSW's requests, the court will address the broadest of the relief it seeks, as that relief encompasses its more narrow requests.

As a general matter, Alabama frowns on restrictive covenants. *See* Ala. Code § 8-1-190(a) ("Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided by this section is to that extent void."). Alabama's current statute governing restraints on trade abrogated Alabama Code § 8-1-1, and the law became effective January 1, 2016. There is no indication that the statute applies retroactively to agreements executed before that date. Presumably, therefore, § 8-1-1 governs the enforceability of MSW Agreements with Messrs. Sparks, Sonderman, McCollister, and Tanner, which they signed before January 1, 2016. However, Mr. McMahan entered his agreement after January 2016, so § 8-1-190 would appear to apply to his Agreement. The parties have presented no argument about the retroactivity of § 8-1-190. Defendants appear to assume that it is retroactive because they do not cite § 8-1-1 and instead rely only on § 8-1-190 for their substantive arguments. (Doc. 30 at 27–33). MSW cites the new statute for the proposition that the court may blue pencil unenforceable portions of covenants not to compete, but it relies on common law interpreting § 8-1-1 to argue that the Agreements are enforceable

partial restraints on trade. (Doc. 31 at 20–21, 29 n.9). Because the parties have not addressed the retroactivity of § 8-1-190, and because the retroactivity of the statute does not affect the outcome of MSW's request for preliminary injunctive relief, the court assumes that the statute is not retroactive.

### a. Solicitation of Clients

Messrs. Sparks, Sonderman, Tanner, and McCollister entered into identical Agreements, but Mr. McMahan's Agreement differs from theirs. Accordingly, the court will address Messrs. Sparks, Sonderman, Tanner, and McCollister first, and Mr. McMahan second.

Messrs. Sparks, Sonderman, Tanner, and McCollister's Agreements provide that "in the event of termination of employment of Employee . . . and for a period of two (2) years after the termination of employment, Employee will not, directly or indirectly, on his own behalf or on behalf of others, contact, solicit, makes sales to or attempt to procure business from any 'client' or 'prospective client' . . . of Employer within [listed states]." (Pl. Exs. 1, 2, 4, 5 at ¶ 4). The Agreements define clients as "any person or entity for which Employer has performed services and rendered a statement within the twenty-four (24) month period preceding the date of termination of employment." (Pl. Exs. 1, 2, 4, 5, at ¶ 4). They define prospective clients as any person or entity "for which a sales presentation has been made within the twenty-four month period preceding the date of termination," any

person or entity Defendants solicited for business while employed at MSW, and any person or entity who, to Defendants' knowledge has been solicited by MSW within the twenty-four month period preceding termination of employment. (*Id.*). MSW is defined to include its "current and subsequent subsidiary, parent, or affiliated companies." (Pl. Ex. 1, 2, 4, 5, at 1).

MSW contends that Messrs. Sparks, Sonderman, Tanner, and McCollister have breached what it generally refers to as the "non-solicitation agreement." (Doc. 31 at 20). Given the breadth of the prohibitions, the court doubts that many of the provisions are enforceable, but it need not address that question at this stage because, to obtain preliminary injunctive relief based on alleged breaches of the provisions, MSW must show a substantial likelihood of success on the merits of its claim that Defendants have actually breached them. It has not done so. The only evidence that MSW has presented about an actual breach is that Messrs. Sparks, Sonderman, Tanner, and McCollister have had contact with some of MSW's current clients.

Before getting into the specifics of their contacts with any MSW clients, the court notes that the provisions at issue apply only "for a period of two (2) years after the termination of employment." (Pl. Exs. 1, 2, 4, 5 at ¶ 4). Accordingly, any contact that Messrs. Sparks, Sonderman, Tanner, and McCollister had with clients before their employment with MSW ended would not violate this provision. As

such, MSW cannot establish a substantial likelihood of success on the merits of this claim based on pre-termination conduct, and the court will address only post-termination conduct.[7]

Mr. Sonderman has had the most contact with MSW clients post-termination. After his resignation, Mr. Sonderman had contact with four MSW clients located in the nine-state geographic restriction contained in his Agreement: Synovus, First US Bancshares, McWane, Inc., and Regions Financial Corporation.

MSW presented evidence through Mr. Cahill's testimony that Mr. Sonderman contacted Synovus after he left MSW. According to Mr. Cahill, Mr. Sonderman was "pushing hard for a meeting," and Mr. Sonderman left several messages, indicating that he wanted to connect with Synovus about CAC "banking opportunities . . . banking, credit card, et cetera." (Tr. at 54). As noted above, Mr. Cahill's testimony on this point is hearsay within hearsay because it is based on what a Synovus client contact told Mr. Harrison who in turn told Mr. Cahill. Although there is no direct evidence in the record to refute Mr. Cahill's testimony, the court would find the evidence more reliable had MSW called Mr. Harrison (who is still employed at MSW) to testify about the nature of Mr. Sonderman's conversations with Synovus. But even if the court accepted Mr. Cahill's testimony

---

[7] To the extent MSW's contends that Defendants' pre-termination conduct "breached their duty of loyalty" to "devote all of their time and attention to MSW," (doc. 11 at ¶¶ 84, 86), MSW does not seek preliminary injunctive relief with respect to this claim. (Doc. 11 at ¶¶ 81, 83).

as true, that Mr. Sonderman pushed for a meeting and wanted to discuss "banking" matters in no way establishes that Mr. Sonderman was soliciting Synovus's business on behalf of CAC. It suggests only that Mr. Sonderman wanted to discuss a non-insurance related matter with Synovus.

MSW also presented evidence that Mr. Sonderman has been in contact with First US Bancshares, McWane, and Regions. When Mr. Sonderman spoke to First US Bancshares, he told the company about CAC, but he did not state that CAC could offer better services. (Tr. at 125). During his conversation with McWane, Mr. Sonderman did not discuss specific services that CAC could provide. (Tr. at 126–27). And, when the McWane client contact told Mr. Sonderman that she planned to follow him to CAC, Mr. Sonderman said that considering this court's temporary restraining order and the pending litigation, they should wait to make additional plans in that regard. (Tr. at 127). Finally, with respect to Regions, the only evidence about the nature of Mr. Sonderman's conversation is that he apologized for not attending a renewal meeting that took place two days after he resigned. (Tr. at 128). Such an apology, with more context or detail, does not amount to solicitation.[8]

---

[8] In fact, this evidence supports Defendants' contention that calls of this type were meant only to acknowledge that some clients were left in a tight spot and not—as MSW implies—thinly-veiled attempts at indirect solicitation. The only evidence about this client suggests that BB&T services Regions' insurance program as part of a multi-year agreement. (Tr. at 618). It is

Mr. Sparks has had contact with two MSW clients located in one of the nine states identified in his Agreement: Synovus and Southern Company. With respect to Synovus, Mr. Sparks explained that he was leaving MSW, but he did not discuss CAC services. (Tr. at 217–19). MSW attempts to show that Mr. Sparks solicited Synovus during this conversation through Mr. Cahill's testimony that Mr. Sparks told Synovus that everyone at MSW was miserable and that CAC could provide the same services as MSW. (Tr. at 57–58). Mr. Cahill does not have first-hand knowledge of that conversation, and he only testified to what Mr. Harrison told him about what Mr. Sparks allegedly shared with Mr. Harrison. The court has considered but gives less weight to Mr. Cahill's testimony for two reasons. First, the multiple levels of hearsay call into question Mr. Cahill's account. Second, his testimony is less persuasive in light of Mr. Sparks' own undisputed testimony that he told Synovus that it had "a great team of people" at MSW. (Tr. at 218).

Mr. Sparks also had breakfast with Southern Company's Risk Manager after he retired from MSW. (Tr. at 225–26). Southern Company was one of Mr. McCollister's MSW clients, and Mr. McCollister attended the meeting as well. (Tr. 412–13). It is undisputed that the Risk Manager contacted Mr. McCollister and asked to get together with him and Mr. Sparks to "catch up." (Tr. at 226).

---

unlikely that Mr. Sonderman would solicit Regions knowing that they are obligated to BB&T for the next several years.

Mr. Sparks and the Risk Manager are personal friends. (Tr. at 226). The evidence establishes that at the breakfast, the Risk Manager asked Mr. Sparks, "[w]hat in the world have you done? Why are you leaving [MSW]?" (Tr. at 225). In response to the question, Mr. Sparks gave Southern Company general information about CAC. (Tr. at 226–27). When asked why he left MSW, he did not relate any of his concerns about MSW. (Tr. at 226). Moreover, Mr. Sparks specifically told his friend that he had a "[non-solicit] agreement which we intend to honor." (*Id.*). This does not constitute solicitation. Therefore, MSW has not demonstrated a likelihood of success on the merits that Mr. Sparks and Mr. McCollister solicited Southern Company.

There is absolutely no evidence that Mr. Tanner had discussions MSW clients based in the nine-state geographic areas since his resignation. Thus, MSW has not established a likelihood of success on the merits of its claim that Mr. Tanner has solicited clients in violation of his Agreement.

In summary, Messrs. Sparks, Sonderman, Tanner, and McCollister have had, at most, *contact* with some of MSW's current clients. Accordingly, the court must address whether the part of the "non-solicitation agreements" preventing contact with clients is enforceable.

Messrs. Sparks, Sonderman, McCollister, and Tanner executed their Agreements when restraints on trade were analyzed under Ala. Code § 8-1-1. In

interpreting that statute, the Alabama Supreme Court held that partial restraints on trade are not subject to the requirements set forth under Alabama Code § 8-1-1 (1975). *Ex parte Howell Eng'g and Surveying, Inc.*, 981 So. 2d 413, 423–24 (Ala. 2006). To determine whether a partial restraint is enforceable, "the court must examine 'the facts of the particular case' and make a determination 'as to whether the restrictions upon one person is greater than necessary for the reasonable protection of a substantial interest of the other party." *Digitel Corp. v. Deltacom, Inc.,* 953 F. Supp. 1486, 1495 (M.D. Ala. 1996) (*citing Affiliated Paper Companies, Inc. v. Hughes,* 667 F. Supp. 1436, 1447 (N.D. Ala. 1987)).

The no-contact provisions here prohibit all contact whatsoever with any person or entity that Defendants solicited for business during their entire employment with MSW or any person of entity to whom MSW, its subsidiaries and affiliates, has made a sales presentation or whom MSW, its subsidiaries and affiliates, has solicited. The court has not located, and MSW has not cited, authority enforcing such a broad restriction. Accordingly, the court finds that the no-contact provision in Messrs. Sparks, Sonderman, McCollister, and Tanner's Agreements is unenforceable. And because the no-contact provision is unenforceable, MSW's evidence that these Defendants have been in contact with its clients cannot establish a substantial likelihood of success on the merits of its breach of contract claim.

The court now turns to Mr. McMahan.  His Agreement provides that he "will not, during the term of his . . . employment and for a period of two years following the date of termination of Employee's employment . . . whether for himself or on behalf of any other person or entity . . . solicit, divert, or take away, or attempt to solicit, divert or take away, on his or her behalf or on behalf of any business in competition with Employer, any 'McGriff Customer' . . . or 'McGriff Prospective Customer' . .  for the purpose of engaging in any 'Competitive Activity.'"  (Pl. Ex. 3 at ¶ 6).

Unlike the other Defendants, Mr. McMahan's contract does not prohibit all contact with MSW clients.  But like the other Defendants, MSW's evidence establishes that contact is all Mr. McMahan has done with respect to its clients.[9] As a result, MSW cannot establish a substantial likelihood of success on the merits of its claim that Mr. McMahan breached the non-solicitation of clients provision contained in his Agreement.

Mr. McMahan has had conversations with three of his MSW clients: Ocwen, Rayonier, and Mohawk.  The day before he resigned, Mr. McMahan told Ocwen that he was leaving MSW and that he would connect the client with other MSW

---

[9] Under § 8-1-190, the court would be inclined to find that the provision of Mr. McMahan's Agreement prohibiting solicitation of prospective clients is void because § 8-1-190(b)(5) expressly contemplates only restrictions on an employee's ability to solicit his former employer's *current* customers.

employees to ensure a successful renewal.  (Tr. at 364–65). That is not solicitation; it's professionalism.

After he resigned, Mr. McMahan had discussions with Rayonier and Mohawk.  During both discussions he told his client contacts that he could not solicit their business because of the restrictive covenant in his Agreement.  (Tr. at 354, 356, 366).   Rayonier also was the recipient of a "blast email" that Mr. McMahan sent to his contacts announcing his decision to join CAC.  (Tr. at 356–57).  Mr. McMahan's signature contained a link to CAC's website, but the email did not state what services CAC could provide to clients.  (Tr. at 357–58).  Nothing about the substance of these communications suggests that Mr. McMahan has solicited MSW clients in violation of his Agreement.

In summary, MSW's evidence shows that Defendants had discussions with MSW clients in the prohibited Southeastern area.  But the Agreements' provision prohibiting contact is too broad to be enforceable, and Defendants' contact does not constitute solicitation.   Accordingly, MSW cannot establish a substantial likelihood of success on the merits.

### b.    Solicitation of Employees

The parties have assumed that the provisions of the Agreements that prohibit solicitation of MSW employees is a restraint on trade.  Therefore, the court will as well for purposes of MSW's motion.  The court need not decide at this stage in the

proceedings whether the agreements not to solicit MSW employees are enforceable,[10] because even if they are, MSW has not demonstrated a likelihood of success on the merits of its claim. Messrs. Sonderman, Sparks, Tanner, and McCollister's Agreements prohibit only solicitation of MSW employees during the two-year period after termination of employment. (Pl. Exs. 1, 2, 4, 5 at ¶ 4). Therefore, only Defendants' post-termination conduct is at issue with respect to solicitation of employees.

MSW's evidence demonstrates that Mr. Sonderman had a conversation with one MSW employee after his resignation: Ms. Nichols. He called Ms. Nichols because he knew it was a difficult time, and he apologized for how the situation had unfolded. (Tr. at 154). The two did not discuss "anything specific about work or about CAC" during the call. (Tr. 178).

The record is undisputed that Mr. Sparks's conversations with various MSW employees other than Ms. Head took place before he resigned. *See supra* pp. 20-22. The record does not indicate when Mr. Sparks spoke with Ms. Head. But assuming that this discussion took place after Mr. Sparks resigned, by Ms. Head's own account, Mr. Sparks never "tried to talk [her] into anything one way or the

---

[10] At least as it concerns Mr. McMahan, the provision prohibiting solicitation, hiring, or employing of MSW's employees likely is void because under § 8-1-190(b)(1), an agreement not to hire or employ an employee is valid only if the employee "holds a position uniquely essential to the management, organization, or service of the business," Ala. Code § 8-1-190(b)(1), and Mr. McMahan's Agreement contains no such limitation.

other," and he "made clear" that the two "were good no matter happened" and that their "friendship was bigger than any of this work stuff." (Tr. at 581). Thus, Mr. Sparks did not solicit or induce Ms. Head to leave MSW.

Likewise, assuming that Mr. Tanner spoke with Ms. Head after his resignation, there is no evidence that he tried to recruit her to leave MSW, and in fact, Ms. Head testified that she is "sure at some point, [Mr. Tanner] tried to talk [her] into staying" at MSW. (Tr. 581). Thus, since his resignation, Mr. Tanner has not solicited or induced any MSW employee to leave.

MSW has presented no evidence that Mr. McCollister had conversations with any MSW employee after his resignation.

Mr. McMahan is situated differently. His Agreement prohibits both pre- and post-termination solicitation of employees. But MSW has presented absolutely no evidence that Mr. McMahan solicited MSW employees to leave. If MSW has demonstrated anything with regard to Mr. McMahan and solicitation, it is that another MSW employee, who is one of Mr. McMahan's best friends (and who remains employed at MSW) solicited Mr. McMahan to leave for CAC. (Tr. 327-28).

### c.    Disclosing and Using Confidential Information

MSW has not established a substantial likelihood that Defendants breached their Agreements by disclosing or using confidential, proprietary, and trade secret

information.  The record is undisputed that Defendants had access to MSW's confidential information while they were employed there, but the record contains no evidence whatsoever that they used or disclosed this information in violation of their Agreements.

Despite its best attempts, MSW has no evidence that the Defendants gave Mr. Denson a list of MSW clients.  Even if the Defendants tried to provide Mr. Denson with such a list, Mr. Denson credibly testified that he considers that a clear violation of non-solicitation and non-disclosure agreements and would not accept it.  (Tr. at 467–68).  Moreover, Mr. Denson testified that specific clients do not really matter; the amount of new business a recruit brings in annually is most important.  (Tr. at 553, 558).

There is also no evidence that the Defendants provided information about MSW revenue.  At the hearing, MSW attempted to prove that the confidential information memorandum that CAC used to recruit employees and secure funding contained revenue projections based on MSW production numbers.  But the testimony among all witnesses is consistent that the various version of the confidential information memorandum never accounted for any MSW employee's revenue.

MSW's sworn complaint also states under penalty of perjury that it sent Defendants cease and desist letters, "asking them to return any confidential

information," but Defendants "have refused." (Doc. 11 at ¶ 79). At the hearing, MSW admitted that this information was inaccurate and stated that its inclusion in the amended verified complaint was "an oversight." (Tr. at 651)

Similarly, MSW's verified amended complaint states that Mr. Sonderman "deleted all of his emails and files from his work laptop" and took three boxes from his office. (Doc. 11 at ¶ 70). MSW presented no other evidence during the hearing to corroborate this statement, and Mr. Sonderman testified that although he might have accidentally deleted some emails, he did not intentionally try to delete any information from his MSW laptop, and he did not walk out with three boxes. (Tr. at 138). Mr. Sonderman took a list of "to dos" for the following week that he said technically contained MSW client information, but MSW offered no evidence that he has refused to give it back. There is also no evidence that Mr. Sonderman used any of the information contained in the "to do" list in his new employment.

### 2. Tortious Interference

Under Alabama law, to establish a claim for tortious interference with business relationships, a plaintiff must show: "(1) the existence of a protectable business relationship; (2) of which the defendant knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage." *White Sands Group, LLC v. PRS II, LLC*, 32 So. 3d 5, 14 (Ala. 2009). "Under Alabama law, mere interference [with a business relationship] is not

47

sufficient to create a cause of action for tortious interference." *Bond v. Trim Line, Inc.*, 465 So.2d 365, 367 (Ala. 1985). "[T]o be actionable, interference must be wrongful, malicious, unlawful, or unjustified." *Id.*

In its brief in support of its motion for a preliminary injunction, MSW argues that its tortious interference claim is based on five specific allegations: (1) Mr. Sparks and Mr. McCollister's contact with Southern Company; (2) Mr. Sonderman calling other clients, including Synovus, to explain what new services CAC could provide; (3) Mr. McMahan calling two MSW customers and encouraging them to move their business to CAC; (4) Mr. Sonderman convincing two MSW customers to move their business; and (5) Mr. Sparks discouraging other MSW producers from attending client meetings during his last month of employment to weaken those client relationships. (Doc. 31 at 35). Although not argued in its brief, during the hearing, MSW stated that testimony about Defendants' meetings with MSW clients outside the Southeast is also relevant to its tortious interference claim. (Tr. at 129). The court addresses each allegation in turn.

First, MSW presented evidence that Mr. Sparks and Mr. McCollister contacted Southern Company, a long-time MSW client. And, Mr. Sparks and Mr. McCollister admit they told Southern Company about CAC and the way the business was structured. (Tr. at 225–27; Tr. at 412–13). But that is the only

evidence about this allegation. And this evidence is insufficient to support MSW's claim. There is no evidence that Mr. Sparks or Mr. McCollister encouraged Southern Company to move its business or discussed next steps necessary to make such a move. (*Id.*). There is also no evidence that Mr. Sparks or Mr. McCollister said anything negative about MSW during this meeting. (*Id.*). Simply put, there is no indication that Mr. Sparks and Mr. McCollister engaged in conduct from which the court could find that they intentionally interfered with MSW's relationship with Southern Company.

Second, MSW contends that Mr. Sonderman tortiously interfered with its relationship with Synovus by calling Synovus and explaining what new services CAC could provide. The record reflects that Mr. Sonderman contacted Synovus on at least three occasions, the first of which was to tell Synovus that Mr. Sparks had left MSW. But there is no evidence or testimony that Mr. Sonderman told Synovus what services CAC could provide. Even by Mr. Cahill's account of the second and third times that Mr. Sonderman contacted Synovus, Mr. Sonderman was "pushing hard" for a meeting and wanted to talk about banking relationships with CAC. This evidence does not demonstrate or even suggest that Mr. Sonderman told Synovus about CAC services.

Third, MSW maintains that Mr. McMahan tortiously interfered with its business relations when he called two clients and encouraged them to move their

business to CAC. The evidence does not substantiate this allegation. Mr. McMahan spoke with three clients about his departure from CAC, but MSW presented no evidence that Mr. McMahan tried to convince those clients to sever ties with MSW. In fact, Mr. McMahan told his clients that he would connect them with the MSW employees who would take over the account and that he could not solicit their business because of the restrictive covenants in his Agreement. (Tr. at 356, 361). Mr. McMahan did not testify that he encouraged these clients to leave MSW, and MSW presented no evidence to that effect.

Fourth, MSW alleges that Mr. Sonderman tortiously interfered with business relationships by convincing two MSW clients to move their business. The record reflects that two of Mr. Sonderman's former MSW clients, TrueEX and TrueDigital, are now CAC clients. But MSW has offered no evidence that Mr. Sonderman even spoke to TrueEX or TrueDigital about CAC or what the substance of any conversation might have been. The record contains no link between Mr. Sonderman (or any Defendant for that matter) and TrueEX's and TrueDigital's decision to move their business other than the fact that they were clients of his at MSW. Without more, the decision of these two clients to leave MSW in no way suggests that Defendants wrongfully coerced or influenced these clients to move their business.

Fifth, Mr. Sparks did not interfere with MSW's business relations by telling other MSW producers not to attend certain client meetings. Although MSW's allegation is not specific, at the conclusion of the preliminary injunction hearing, MSW confirmed that this allegation concerns Mr. Cahill's testimony that someone told Mr. Harrison he was not to attend a board meeting at Synovus. (Tr. at 44–46, 159, 649). But the undisputed evidence is that neither Mr. Sparks nor Mr. Sonderman staffed more than two MSW employees to attend board meetings at Synovus, and Synovus told Mr. Sparks that three people were not needed. (Tr. at 159) Therefore, Mr. Sparks and another MSW employee with seniority over Mr. Harrison would attend the meeting. (*Id.*). Based on the undisputed testimony, the decision to have only two MSW employees at the Synovus meeting was a decision that Synovus itself made. Thus, Mr. Spark's decision to tell Mr. Harrison not to attend cannot be construed as tortious interference.

Finally, concerning Defendants' meetings with clients outside the Southeast, the undisputed evidence is that Defendants shared information about CAC with these clients, but they did not make disparaging or negative comments about MSW in the process. And there is no evidence that any of these clients have moved their business to CAC. Therefore, MSW has not shown wrongful interference with its business relations with respect to its clients located outside of the Southeastern area identified in Defendant's Agreements.

There is no evidence before the court at this stage in the proceedings which demonstrates that Defendants' contact with MSW clients was wrongful, malicious, unlawful, or unjustified. Accordingly, MSW has not demonstrated a substantial likelihood of success on the merits of its tortious interference claim.

## III. CONCLUSION

As stated above, MSW has not demonstrated a likelihood of success on the merits of its breach of contract and tortious interference claims. Accordingly, the court **DENIES** MSW's motion for a preliminary injunction and **LIFTS** the temporary restraining order.

**DONE** and **ORDERED** this September 23, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE